UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

TEXTRON FINANCIAL CORPORATION,                    Civ. No. 10-2070 (JRT/LIB)

        Plaintiff,

v.                                                                **REPORT AND
                                                                  RECOMMENDATION**

WEERES INDUSTRIES CORPORATION

        Defendant.

---

This matter is before the Court upon Plaintiff's Motion for Summary Judgment, which has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. Based on the stipulation of the parties, the motion was deemed submitted on the papers and was taken under advisement as of March 17, 2011. For the reasons set forth below, it is recommended that Plaintiff's Motion for Summary Judgment be granted in part and denied in part.

## I.  BACKGROUND

Plaintiff Textron Financial Corporation ("Textron") filed this breach of contract action on May 17, 2010. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). The Scheduling Order in the present case was issued on September 23, 2010, which established the following relevant deadlines: fact discovery ends on June 20, 2011; nondispositive motions must be filed and heard by June 20, 2011; dispositive motions are to be filed by August 20, 2011; and the case is to be ready for trial by January 9, 2012. (Dkt. 15). On November 3, 2010, the present Motion for Summary Judgment was filed by Textron. The Motion was referred to the undersigned for a Report and Recommendation on February 1, 2011.

### A.       The Repurchase Agreement

Textron is a commercial lender that was in the business of providing financing for dealers of marine and watercraft goods.  Defendant Weeres Industries Corporation ("Weeres") is in the business of manufacturing and distributing watercraft.  Weeres sells its products to "retail dealers or wholesale distributors  . . . who frequently desire to finance such purchases."  (First Molyneux Aff., Dkt. 19, Exh. 1, at p. 1).

As material inducement for Textron to finance the acquisition of Weeres inventory by dealers, Weeres entered into a Repurchase Agreement with Textron on October 28, 2005.  (Id. at ¶ 2; Exh. 1).  Richard Molyneaux, who is the Vice President of Sales at Textron, states that Textron "would not have financed the acquisition of Weeres inventory by Weeres Dealers if Weeres did not execute the Repurchase Agreement."  (Id. at ¶ 3).  Francis Luikart II, who is the Chief Financial Officer of Weeres, helped negotiate and finalize the Repurchase Agreement with Textron.  (Luikart Aff., Dkt. 22, at ¶s 2-4).  Luikart states that manufacturer repurchase agreements are common in the watercraft industry and allow a manufacturer to ensure the availability of financing for dealers of its products.  (Id. at ¶ 5).  Each dealer that obtained financing from Textron was subject to a separate agreement with Textron, and Weeres was not a party to the dealer financing agreements with Textron.  (Id. at ¶ 8).

As relevant here, the Repurchase Agreement provides as follows:

> "Should Textron Financial at any time repossess or otherwise come into possession of any Goods financed or refinanced by Textron Financial for any Dealer (whether acquired by such Dealer from [Weeres] or from a Distributor of such Goods), with or without notice to or approval of [Weeres], [Weeres] shall repurchase such Goods from Textron Financial upon the following terms and conditions:

2

> (a)   [Weeres] shall repurchase such Goods from Textron Financial within thirty (30) calendar days upon receipt of notice from Textron Financial that such Goods are in Textron Financial's possession, wherever located and in new and unused condition, subject to normal wear and tear incident to display and demonstration, without any express or implied warranties as to merchantability or fitness for a particular purpose[.]"

(Repurchase Agreement, at pp. 1-2, ¶ 3). The Repurchase Agreement provides that the repurchase price for the goods will be equal to a percentage of the invoice costs for the goods based upon the length of time between the original invoice and Textron's request for repurchase. (Id. at ¶ 3(b)).  In particular, the repurchase price would be 100 percent of the invoice cost if Textron made the request within 360 days of the invoice; 90 percent of the invoice cost if the request was made within 361 to 540 days of the invoice date; and 0 percent of the invoice cost if the repurchase request was made more than 540 days after the date of the invoice.  (Id.)  Weeres would also be responsible for "all reasonable expenses incurred by Textron Financial in connection with the repossession and/or storage of such Goods (including legal fees)."  (Id.)

As relevant here, the Repurchase Agreement also stated:

> "The obligations of [Weeres] under this Agreement are absolute and unconditional.   [Weeres] shall not be released from such obligations for any reason, nor shall such obligations be reduced, diminished or discharged for any reason.  [Weeres] waives (i) any right to require Textron Financial to proceed against a Dealer or to pursue any other remedy prior to exercising Textron Financial's rights under this Agreement, other than as may be expressly set forth herein, (ii) notice of the acceptance of this Agreement by Textron Financial, the non-performance of any Obligation of any Dealer owing to Textron Financial (individually, and 'Obligation' and collectively, the "Obligations"), or the amount of the Obligations outstanding at any time, (iii) demand and presentation for payment upon the applicable Dealer, (iv) protest and notice of protest and diligence of bringing suit against any Dealer, and (v) any other defense to [Weeres'] obligations under this Agreement."

3

(Repurchase Agreement, at p. 3, ¶ 8). In reliance on the Repurchase Agreement, Textron financed the purchase of Weeres products through loan agreements with Weeres product dealers. (First Molyneux Aff., at ¶s 4-5).  Textron sent payment for the purchased products directly to Weeres after receiving the wholesale invoice from Weeres.  (Id.)

### B.       Weeres Defaults under the Repurchase Agreement

Beginning in March 2008, Textron took possession of Weeres products from several dealers and began making repurchase requests of Weeres.  (Harris Aff., Dkt. 23, at ¶ 8).  These repurchase requests continued through 2009.  (Id.)

On March 27, 2008, Textron sent a letter to Weeres requesting repurchase of inventory financed for Williams Boat Country and repossessed by Textron.  (First Molyneaux Aff., at ¶ 9; Exh. 2).  On December 4, 2008, Textron sent a letter to Weeres providing notice that it had repossessed property from Tiger Marine, Inc., and requesting that Weeres repurchase the inventory.  (Id. at ¶ 11; Exh. 3).  On February 6, 2009, Textron requested that Weeres repurchase inventory financed for Coastal Boat Sales, Inc., and repossessed by Textron.  (Id. at ¶ 13; Exh. 4).  On February 25, 2009, Textron requested repurchase of inventory financed for Heartland Marine, L.L.C., and repossessed by Textron.  (Id. at ¶ 15; Exh. 5).  Weeres failed to repurchase the inventory as requested by Textron under the terms of the Repurchase Agreement.  (Id. at ¶s 10-16).

On April 14, 2009, Textron sent a letter to Weeres stating that due to its failure to repurchase the inventory financed for Heartland Marine, L.L.C., Textron would mitigate its damages by remarketing the inventory.  (Id. at ¶ 8; Exh. 6).  The letter also notified Weeres that Textron would then pursue any deficiency balance that was still due after the sale of the

4

inventory from Weeres.  (Id.)  On September 2, 2009, Textron sent another letter to Weeres stating that due to its failure to repurchase the inventory financed for Williams Boat Country, Tiger Marine, Inc., Coastal Boat Sales, Inc., and Heartland Marine, L.L.C., Textron was in the process of mitigating its damages by remarketing the inventory.  Textron again stated that it would pursue any deficiency balance remaining after the sale of the inventory from Weeres.  (Id. at ¶ 9; Exh. 7).

Textron sold the Weeres inventory through auctions, private sales, and consignment sales.  (Id. at ¶ 22).  The inventory repossessed from Heartland Marine, L.L.C. and Tiger Marine, Inc. was sold at an auction in St. Joseph, Minnesota, that was conducted by Asset Management, Inc. (Id. at ¶ 23).  Asset Management specializes in the sale of repossessed inventory and holds auctions that are open to the public that usually draw an average of 1,200 to 1,500 buyers.  (Id. at ¶s 24-25).  The inventory repossessed from Coastal Boat Sales, Inc. was sold both via consignment sales by other dealers in the area and through private sales following a private bid process. (Id. at ¶ 26).  With respect to consignment sales, the dealers displaying the inventory reported potential sales to Textron and Textron would then either approve or decline the proposed sale. (Id. at ¶ 26). The inventory repossessed from Williams Boat Country was sold via consignment sales.  (Id. at ¶ 27).

According to Textron's initial motion papers, the units were financed for a total of $904,728.87 and were sold for $621,239.90, which is approximately 68 percent of the original invoice price.  (Id. at ¶ 28).  Textron claimed a deficiency of $231,457.94 and repossession costs of $19,061.39, for a total damages claim of $250,519.33.  (Id. at ¶ 29).

In its response to Plaintiff's Motion for Summary Judgment, Weeres pointed out that in certain instances Textron had charged an invoice price of 100 percent even though the repurchase request was made more than 360 days after the inventory was invoiced.  In its Reply, Textron submitted an updated claim for damages to reflect updated figures for 15 units for which it was only entitled to 90 percent of the invoice price.  (Second Molyneaux Aff; Dkt. 26 at ¶s 3-6; Exh. 1).  With these adjustments, Textron now claims damages of $233,295.47.  (Id. at ¶ 7).

In its Answer, Weeres "admits that the Repurchase Agreement is a binding contract and that [Weeres] was in breach in one or more respects under the Repurchase Agreement."  (Ans., Dtk. 4, at ¶ 7).  However, Weeres claims that Textron's claim is subject to reduction or elimination by reason of Textron's failure to mitigate damages and its failure to liquidate the inventory in a commercially reasonable manner.  (Id. at ¶s 9-10).

According to Steve Harris, who was responsible for the sales and invoicing of dealer purchases at Weeres, in late 2008 Textron notified Weeres that it was exiting the business of financing dealer acquisition of watercraft from manufacturers.  (Harris Aff., at ¶ 12).  During the following months, "significant changes occurred in Textron's personnel through layoffs and resignations and resulted in frustrated attempts by Weeres to correct repurchase pricing mistakes, negotiate terms of repurchase, and prevent dealer defaults that would require repurchase."  (Id.)  During its exit from the watercraft financing business, "Textron aggressively liquidated collateral at auction and through other channels that significantly depressed the price received for the goods."  (Id. at ¶ 13).  In addition, Textron "significantly increased the pace and number of repossessions of Weeres product from dealers."  (Luikart Aff., at ¶ 18).  Harris asserts that the "methods used by Textron to liquidate repossessed collateral did not comport with commercially

reasonable practices used by other members of the watercraft industry." (Harris Aff., at ¶ 13). In particular, Harris states:

> "The method and manner of liquidation of Textron's liquidation directly resulted in the devastation of prices of Weeres product. Textron took unreasonable steps to liquidate the subject inventory in the primary market and did so at unreasonably discounted prices. As a result, Textron obtained significantly less than the fair market value of the products, damaged their own recovery, further damaged other dealer's ability to sell our products and prevent additional defaults, and destroyed Weeres ability to sell any additional product within the primary market for years."

(Id. at ¶ 14). According to Luikart, he generally received the repurchase requests as CFO of Weeres; such requests were not uncommon during his time at Weeres. (Luikart Aff., at ¶ 13). Luikart states that in past dealings with Textron, "Weeres was regularly given the opportunity by Textron to make arrangements to avoid the need for Textron to take possession of collateral from dealers." (Id. at ¶ 14). Luikart described the process as follows:

> "Depending on the individual circumstances, Weeres would generally proceed with either: (1) making the monthly interest payments to Textron and leave the boats in place at the dealership to permit an opportunity to sell them in place; or (2) coordinate with another dealer that conduct [sic] business with Weeres in the area so that it could repurchase and retrieve the boats. Under these practices, Weeres would be able to ostensibly break-even or otherwise have relatively nominal costs."

(Id. at ¶ 15). Luikart states that these arrangements "consistently provided a commercially acceptable resale price, and allowed Weeres to honor its obligations under the Repurchase Agreement without flooding the market with excess inventory." (Id. at ¶ 16).

Luikart notes that in light of the change in Textron's conduct, Weeres was unable to sustain the burden of the repossessions. (Id. at ¶ 19). Luikart states that in one instance, Weeres identified a buyer that was willing to purchase significant inventory from a dealer at risk of

default, but Textron refused to refinance the boats, resulting in the repossession and repurchase demand that Weeres could not afford to meet.  (Id. at ¶ 20).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when the evidence demonstrates that there are no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(a); Smutka v. City of Hutchinson, 451 F.3d 522, 526 (8th Cir. 2006).  A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Mirax Chemical Products Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991).  The nonmoving party may not rest on mere allegations or denials in its pleadings but must set forth specific evidence-based facts showing the existence of a genuine issue.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).  The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  No genuine issue of fact exists in such a case because "a

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

## III.    DISCUSSION

As a threshold matter, the law of the state of Rhode Island governs the application and interpretation of this contract pursuant to the choice of law clause contained in the Repurchase Agreement.  (Repurchase Agreement, at ¶ 8).

Textron argues that there are no genuine issues of material fact that Textron and Weeres were parties to a binding and enforceable contract, that Weeres breached the Repurchase Agreement by failing to repurchase Weeres inventory according to the terms of the Repurchase Agreement, and that Textron was damaged by this breach.  Textron further argues that Weeres has no defenses that would preclude summary judgment, and therefore asks that the motion be granted and that it be awarded damages in the amount of $233,295.47.   (Pl.'s Reply, Dkt. 25, at p. 8).

For its part, Weeres does not dispute that the Repurchase Agreement is enforceable and concedes that it breached the agreement by failing to repurchase Weeres inventory.  However, Weeres argues that genuine issues of material fact exist as to whether Textron liquidated the inventory in a commercially reasonable manner, whether Textron failed to mitigate its damages, and whether Textron breached the implied covenant of good faith and fair dealing.

### A.    Applicability of Article 9 of the UCC to the Repurchase Agreement

Weeres contends that Textron failed to liquidate the inventory it repossessed in a commercially reasonable manner as required by Rhode Island's version of Article 9 of the

Uniform Commercial Code (UCC).  R.I.Gen.Laws § 6A-9-101 – § 6A-9-710.   Textron contends that this argument fails as a matter of law because Article 9 does not apply to the Repurchase Agreement.

As relevant here, Article 9 of the UCC requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."  R.I.Gen.Laws. 6A-9-610(b).  Subject to certain exceptions, Article 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract."  R.I.Gen.Laws § 6A-9-109(a).  A "security interest", as defined by the UCC, is "an interest in personal property or fixtures which secures payment or performance of an obligation," including "any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to chapter 9."  R.I.Gen.Laws § 6A-1-201(35).

Textron contends that the Repurchase Agreement does not fall within the scope of Article 9 because it does not create a security interest and does not otherwise constitute a secured transaction with the meaning of Article 9.  The Court agrees.  In the Repurchase Agreement, Weeres agreed to repurchase any Weeres inventory that Textron came into possession of based on a loan furnished by Textron not to Weeres, but rather, to dealers of its products.  The Repurchase Agreement is related to transactions between Textron and Weeres dealers that created security interests, but the transactions between Textron and the dealers are entirely separate from the Repurchase Agreement.  While the secured transactions between the dealers and Textron would undoubtedly fall within the scope of Article 9, the Repurchase Agreement itself **does not** constitute a transaction creating a security interest that would secure the payment

or performance of a contractual obligation; therefore, Article 9 does not apply in the present case.[1]

Weeres attempts to bring the Repurchase Agreement within Article 9 by arguing that it is an "obligor" within the meaning of Article 9, which defines an obligor as:

> "a person that, with respect to an obligation secured by a security interest in or an agricultural lien on the collateral, (i) owes payment or other performance of the obligation, (ii) has provided property other than the collateral to secure payment or other performance of the obligation, or (iii) is otherwise accountable in whole or in part for payment or other performance of the obligation."

R.I.Gen.Law § 6A-9-102(a)(59).  Weeres contends that it qualifies as an "obligor" because the Repurchase Agreement "imposes an obligation upon Weeres for the entire payment on the dealer's purchases in the event of a Repurchase Request."  (Def.'s Memo. in Opp., Dkt. 21, at p. 16).  The Court is unpersuaded by this argument.

---

[1]  The parties have not cited and the Court has been unable to find any controlling Rhode Island authority that has considered whether a similar agreement falls within the scope of Article 9. However, other jurisdictions have concluded that a repurchase agreement, or a similar arrangement, does not fall within the scope of UCC Article 9.  See e.g., Velazquez v. Marine Midland Automotive Financial Corporation, 590 A.2d 116, 121 n. 5 (Conn.App. 1991)("a transfer of repossessed collateral from a financing company to a seller, pursuant to a repurchase agreement, is not a sale or disposition of the collateral under the Uniform Commercial Code"); Corpus Juris Secundum, 79 C.J.S. Secured Transactions § 203 ("A transfer of collateral from the secured party to a person who is liable to a secured party under a guaranty, endorsement, repurchase agreement or the like is not a sale or disposition of the collateral"), and Matter of Financial Corp., 1 B.R. 522, 526 n. 7 (W.D.Mo. 1979)("Appellant contends that an obligation to repurchase would cause the repurchase agreement to be governed by Article 9 of the Uniform Commercial Code.  While this repurchase agreement had many of the attributes of a secured loan, there was nothing in the record to indicate that this transaction was intended to effectuate a security interest.").  The guidance provided by these cases bolsters the Court's conclusion that Article 9 is not applicable to the Repurchase Agreement at issue in the present case.

Again, the Court has not found any controlling Rhode Island authority construing the term "obligor" under Article 9 of the UCC, and Weeres has not provided any authority in support of its construction of the term obligor. As the Court understands the statute, in order to be an obligor within the meaning of the above provision, Weeres must owe performance or payment of the obligation that is secured by a security interest. In other words, Weeres must owe performance or payment **of the obligation that is secured pursuant to the security agreement** with Textron. However, Weeres does not owe payment or performance of the dealer's obligations under the security agreement. Rather, Weeres' obligation to repurchase inventory is separate from the obligation of the dealers, and the Repurchase Agreement itself is not a secured transaction. Therefore, Weeres is not an "obligor" within the meaning of Article 9. See, e.g., Drewry v. Starr Motors, Inc., 2008 WL 2035607 at *3 (E.D.Va. May, 12 2008)(plaintiffs were not obligors under Article 9 because they were not contractually required to make payments to dealer for vehicle). If Weeres was obligated to perform or pay under the terms of the security agreements between Textron and the dealers, Weeres would qualify as an obligor under Article 9. However, Weeres readily admits that it was not a party to the secured transactions between Textron and the dealers. (Luikart Decl., at ¶ 8 ("Weeres was not a party to such agreements [between Textron and the dealers] and it received no information on the financial condition of the dealers"). The Court concludes that Weeres is not an obligor, and therefore, the Repurchase Agreement does not fall within the scope of Article 9.

Because the Repurchase Agreement does not fall within the scope of Article 9, Weeres' argument that Textron did not liquidate the inventory in a commercially reasonable manner fails as a matter of law.

### B.    Mitigation of Damages

12

Next, Weeres contends that there are genuine issues of material fact regarding whether Textron properly mitigated its damages.

Under the law of Rhode Island, "a party claiming injury that is due to breach of contract…has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages." Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016, 1026 (R.I. 1998), citing Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury, 603 A.2d 726, 729 (R.I. 1992)("the doctrine of avoidable consequences states that a party may not recover damages 'that the injured could have avoided without undue risk, burden or humiliation'"). "This rule prevents parties from sitting idly by and permitting their damages to accumulate." Bibby's Refrigeration, 603 A.2d at 729.  "Although the aggrieved party has the duty to mitigate, he or she does not incur liability for failing to do so"; rather, "[t]he aggrieved party is simply prohibited from recovering damages that he or she could reasonably have avoided." Id. [citations omitted].  "The law commands reasonable efforts and ordinary care in the circumstances . . . not Herculean exertion." Tomaino, 709 A.2d at 1027, citing Fleet National Bank v. Anchor Media Television, Inc., 45 F.3d 546, 561 (1st Cir. 1995). "When mitigation of damages is at issue the defendant has the burden of proving by affirmative evidence, that the plaintiff failed to adequately mitigate his or her damages." McFarland v. Brier, 769 A.2d 605, 610 (R.I. 2001), citing Bibby's Refrigeration, 603 A.2d at 719.  See also, Saunders Real Estate Corp. v. Landry, 769 A.2d 1277, 1281 (R.I. 2001)("the burden of proof rests on the party claiming that another litigant has failed to mitigate damages.'"), quoting Riley v. St. Germain, 723 A.2d 1120, 1123 (R.I. 1999)

The Court finds that after a careful review of the record, it is clear that Textron did in fact mitigate its damages by selling the inventory through auction, consignment sales, or private

sales.  Weeres contends that the record is insufficient to establish that Textron acted reasonably in mitigating its damages.  The Court is unpersuaded by this argument and finds that Weeres has not met **its** burden of showing that Textron did not properly mitigate its damages.

As an initial matter, the Court notes that Weeres' primary argument is that Textron did not liquidate the inventory in a "commercially reasonable manner." However, the Court has already concluded that the commercial reasonableness standard is inapplicable in the present case because the Repurchase Agreement does not fall within the scope of UCC Article 9.

Weeres also contends that Textron's conduct was not reasonable because it departed from prior practice.  It appears that this argument is based on the fact that Textron would not agree to refinance the inventory with another dealer, and by not permitting Weeres to make interest payments to cure a dealer's default.  Weeres essentially argues that Textron could have avoided the need for requesting repurchase of inventory by allowing the transactions to be refinanced with other dealers or by permitting Weeres to cure the defaults.  However, this argument is based on the premise that, based on its duty to mitigate, Textron should not have taken action that it was legally entitled to take.  If a dealer was in default, Textron was entitled to repossess the collateral and request repurchase by Weeres, and upon Weeres' failure to fulfill its obligation to repurchase the inventory, Textron need only take reasonable efforts to mitigate its damages.  The Court does not believe that the duty to mitigate requires Textron to refrain from action that the agreements specifically provide for and contemplate.  Notably, the Repurchase Agreement specifically states that Textron has "no obligation to finance Goods for any Dealer, [Weeres], or otherwise, and Textron Financial has no obligation to notify [Weeres] of Textron Financial's decision to terminate its relationship with, or stop funding [Weeres] or any of its Dealers." (Repurchase Agreement, ¶ 9).  Clearly, Textron was specifically relieved of any obligation to

refinance or to continue to provide financing for dealers of Weeres inventory.  In addition, Weeres expressly waived "any right to require Textron Financial to proceed against a Dealer or to pursue any other remedy prior to exercising Textron Financial's rights under this Agreement." Textron was not obligated to pursue these other remedies before lodging repurchase requests with Weeres, even if it may have decided to do so in some instances in the past.  As such, the Court finds the availability of other accommodations that would have been more favorable to Weeres, short of repossession and repurchase, to be irrelevant to the mitigation issue.

Next, Weeres contends that Textron's methods compounded its own damages and resulted in additional damage to Weeres by depressing the market for its products.  First, to the extent that Textron's liquidation caused damage to the price of Weeres' product, the Court finds that this does not show that it failed to mitigate its damages.  The duty to mitigate focuses on the damages of the non-breaching party; it does not encompass a collateral duty not to cause secondary damage to the breaching party.  Moreover, there is no factual support in the record for the general claim that Textron compounded its damages by depressing market prices, aside from the conclusory statements offered by Weeres.  Simply put, Weeres has not pointed to a single Weeres product that was sold by Textron for an unreasonably low price.  This is not sufficient to preclude summary judgment.

The Court finds that Weeres has failed to raise a genuine issue of material fact as to the reasonableness of Textron's efforts to mitigate damages.  It may be that Textron could have obtained higher prices using some other methods, but the law does not require that the mitigating party's efforts turn out to be the best course of action.  See, e.g., Veranda Beach Club Ltd Partnership v. Western Sur. Co., 936 F.2d 1364, 1386 (1st Cir. 1991)("a party charged with mitigating damages is not obligated to play the seer, choosing the course of action that would, in

hindsight, have turned out best.")  Textron reasonably and diligently attempted to mitigate its damages in the present case by liquidating the inventory when Weeres breached the Repurchase Agreement.  Weeres now has the burden of coming forward with evidence to create a genuine issue of material fact.  However, Weeres has not adequately demonstrated how or why Textron's conduct was deficient.  Although Weeres has requested additional discovery on the mitigation issue, it has failed to carry its burden of showing that such discovery justifies a denial of summary judgment at this time.[2]  Accordingly, under the circumstances of this case, the Court concludes that Textron's efforts to mitigate damages were reasonable and diligent and resulted in a reduction of the amount of damages Textron incurred.  Textron is therefore entitled to summary judgment on this issue.

---

[2]   Weeres contends that summary judgment is not proper because it has not had an adequate opportunity to conduct discovery to support its arguments.  Fed. R. Civ. Pro. 56(d) allows a party to request a denial of summary judgment if the party can make a showing that postponement of the ruling would enable it to discover additional evidence which might rebut the movant's showing of the absence of a genuine issue of material fact.  Weeres does not specifically ask for relief under Rule 56(d), and even if it did, the Court finds that such relief is not justified here.  In order to be granted such relief, the requesting party is required "to show 'what specific facts further discovery might unveil.'"  United States ex. rel. Bernard v. Casino Magic Corp., 293 F.3d 419, 426 (8th Cir. 2002), quoting Stanback v. Best Diversified Products, Inc., 180 F.3d 903, 911 (8th Cir. 1999).  The decision to grant or deny such relief is within the sound discretion of the Court.  Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 797 (8th Cir. 1996).  Weeres had more than three months to pursue discovery before its response was due.  In addition, between the filing of Textron's Motion for Summary Judgment and the filing of its response, Weeres had more than two months to at least obtain some discovery before it filed its response to the motion.  There is no indication that Weeres made any effort to pursue discovery during that period, nor is there any indication that relevant discovery was requested and not answered.   Indeed, after Textron filed its Motion, Weeres was precisely aware of Textron's arguments and therefore could have pursued discovery that was specifically tailored to responding to Textron's Motion.  Given Weeres' failure in this respect, the Court finds little merit in its claim that summary judgment should be denied at this stage so that Weeres may pursue discovery.  Therefore, to the extent Weeres seeks relief pursuant to Fed. R. Civ. Pro. 56(d), the request should be denied.

In any event, the Court would nevertheless recommend that summary judgment be granted in favor of Textron on this issue because it believes that Weeres has waived the defense of failure to mitigate damages.  The Repurchase Agreement states that:

> "The obligations of [Weeres] under this Agreement **are absolute and unconditional**.  [Weeres] shall not be released from such obligations for any reason, **nor shall such obligations be reduced, diminished or discharged for any reason.**  [Weeres] waives (i) any right to require Textron Financial to proceed against a Dealer or to pursue any other remedy prior to exercising Textron Financial's rights under this Agreement, other than as may be expressly set forth herein, (ii) notice of the acceptance of this Agreement by Textron Financial, the non-performance of any Obligation of any Dealer owing to Textron Financial (individually, and 'Obligation' and collectively, the "Obligations"), or the amount of the Obligations outstanding at any time, (iii) demand and presentation for payment upon the applicable Dealer, (iv) protest and notice of protest and diligence of bringing suit against any Dealer, and (v) **any other defense** to [Weeres'] obligations under this Agreement."

(Repurchase Agreement, at ¶ 8)[emphasis supplied].

"[C]lear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions."  See, Burke v. Potter, 771 A.2d 895, 895 (R.I. 2001).  In the present case, the Repurchase Agreement explicitly relieves Textron from pursuing alternative remedies prior to seeking repurchase from Weeres.  It provides that Weeres' obligation to repurchase upon request of Textron is absolute and unconditional and will not be "reduced, diminished or discharged."  Lastly, Weeres waived any other defense to its obligations under the Repurchase Agreement.  Reading these provisions together, Weeres has clearly and unambiguously waived its right to claim that Textron failed to act reasonably in mitigating its damages incurred by Weeres' breach.  The parties' contract contemplates that Weeres would have an absolute obligation to repurchase inventory, and that no

defenses could be asserted to that obligation, including the affirmative defense of mitigation of damages.  The Repurchase Agreement clearly provides Textron with substantial rights as against Weeres.  However, this is the bargain that the parties agreed to, and the Court will not upset the parties' clear intent.  See, Gorman v. Gorman, 883 A.2d 732, 739 n. 11 (R.I. 2005)("The parties to a contract are free to agree upon any terms that are not illegal"), quoting Psaty & Fuhrman, Inc. v. Housing Authority of Providence, 76 R.I. 87, 93 (1949); Durfee v. Ocean State Steel, Inc., 636 A.2d 698, 703 (R.I. 1994)("It is a basic tenet of contract law that the contracting parties can make as 'good a deal or as bad a deal' as they see fit, limited to some extent by certain rules of enforcement."); Hord Corp. v. Polymer Research Corp. of America, 275 F.Supp.2d 229, 238 (D.R.I. 2003)("An unambiguous contractual clause, agreed upon by both parties, cannot be rendered meaningless, because one party does not like its strict application.")[3]

Thus, pursuant to the clear language of the Repurchase Agreement, Textron had no duty to mitigate its damages in this case, and Textron is entitled to judgment as a matter of law on this issue.

**C.      The Covenant of Good Faith and Fair Dealing**

Next, Weeres contends that summary judgment is improper because there are genuine issues of material fact on the issue of whether Textron breached its duty of good faith and fair dealing.

---

[3]   Weeres argues that a party cannot knowingly waive defenses without designating specific grounds or defenses.  (Def.'s Memo. in Opp., at p. 21).  Weeres has failed to provide any controlling or apposite authority for this argument.  As already detailed above, the Court finds that the language is not vague or ambiguous, notwithstanding the fact that it does not specifically list the defenses that have been waived.

Under Rhode Island law, "virtually every contract contain[s] an implied covenant of good faith and fair dealing between the parties." Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996), quoting Crellin Technologies, Inc. v. Equipmentlease Corp., 18 F.3d 1, 7 (1st Cir. 1994). "The implication of the duty is that the parties will act in a manner consistent with the purposes of the contract." Lifespan/Physicians Professional Services Organization, Inc. v. Combined Insurance Company of America, 345 F.Supp.2d 214, 225 (D.R.I. 2004). "Under Rhode Island law, the standard for determining whether a party has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct." Pride Hyundai, Inc. v. Chrysler Financial Co., LLC, 263 F.Supp.2d 374, 394 (D.R.I. 2003).

The breach of such a duty gives rise to a breach of contract claim. Fleet National Bank v. Liuzzo, 766 F.Supp. 61, 67 (D.R.I. 1991). However, "[a] breach of the covenant of good faith and fair dealing must be premised on a contractual obligation, because 'an implied duty presupposes that an obligation exists.'" Sax v. Diprete, 639 F.Supp.2d 165, 172 (D.Mass. 2009), quoting Dovenmuehle Mortgage, Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002)(absence of a contractual obligation to pay taxes precluded as a matter of law a finding that the plaintiff violated the covenant of good faith and fair dealing by failing to pay those taxes).

Weeres' good faith and fair dealing argument is subsumed within its mitigation argument. As detailed above, Textron had no duty to mitigate its damages based on Weeres' failure to repurchase according to the terms of their contract. Because the argument is based on a contractual obligation that did not exist, Weeres' good faith argument fails as a matter of law. Moreover, the Court has already concluded that Textron's actions were reasonable, and Weeres has not put forth any evidence that would otherwise establish that Textron's actions in

liquidating the collateral were not taken in good faith.  As such, this argument also fails and does not preclude summary judgment.

### D.     Amount of Damages

The Repurchase Agreement provided that the repurchase price would be determined according to the invoice date.  If the repurchase request was made more than 360 days after the invoice date, Weeres was only obligated to pay 90 percent of the invoice cost, as opposed to 100 percent prior to that.   However, Textron has in some instances apparently billed Weeres erroneously for 100 percent of the invoice cost when it was only entitled to 90 percent.  (Harris Aff., at ¶ 10).  In its Reply, Textron offered the Declaration of Richard Molyneaux, who stated that he identified fifteen units for which he had erroneously demanded 100 percent of the invoice cost.  (Second Molyneaux Aff., at ¶ 3).

The Court finds that it is unable to enter summary judgment as to the amount of damages because Textron has failed to carry its burden of presenting an undisputed factual record as to the amount of damages that are owed.  The Court cannot determine whether Textron has adequately remedied all the damages deficiencies simply based on the limited information provided by Richard Molyneaux in Textron's Reply.  Therefore, the Court will recommend that Plaintiff's Motion for Summary Judgment be denied but only as to the actual amount of damages that are owed by Weeres until any scrivener errors in the repurchase requests have been rectified.[4]

### IV.     CONCLUSION

---

[4]   The Court has simultaneously issued an Order on Plaintiff's Motion to Stay Discovery which addresses what limited additional discovery on damages will be permitted, which will be limited only to the remaining issue of computing and verifying the actual amount of damages in light of this Report and Recommendation.

There are no genuine issues of material fact and Plaintiff, Textron, is entitled to judgment as a matter of law on the issue of Defendant, Weeres', liability on Textron's breach of contract claim against Weeres.  The Repurchase Agreement is enforceable, and Weeres breached the Repurchase Agreement resulting in damage to Textron.  In addition, Weeres has not adequately met its burden on its affirmative defenses that would preclude summary judgment at this stage.  However, Textron has failed to present an undisputed factual record with respect to the computation of its actual damages due to the record errors, and therefore, summary judgment is not appropriate at this time as to the actual amount of damages that should be awarded to Textron.[5]

For the foregoing reasons, and based upon all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

Plaintiff's Motion for Summary Judgment [Docket No.16] be GRANTED in part as described above, but DENIED in part as to amount of actual damages.

Dated: June 17, 2011                             s/Leo I. Brisbois
                                                 LEO I. BRISBOIS
                                                 United States Magistrate Judge

# N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by July 1, 2011,** a writing that

---

[5]  As noted in this Court's simultaneously issued Order on Plaintiff's Motion to Stay Discovery, the remaining damages issue is quite limited.  The Court is confident that the correction of the record errors and a determination of the exact amount of damages could be easily resolved by the parties without further significant Court intervention.

specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.   Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.